# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

KEITH A. WILSON,

|  |  |  |
|---|---|---|
| Petitioner, | : | Case No. 3:14-cv-176 |
| - vs - |  | District Judge Walter Herbert Rice |
|  |  | Magistrate Judge Michael R. Merz |
| WARDEN, |  |  |
| Lebanon Correctional Institution, |  |  |
|  | : |  |
| Respondent. |  |  |

# REPORT AND RECOMMENDATIONS

This habeas corpus case is before the Court for decision on the merits.

Petitioner Keith Wilson was sentenced to twenty-three years to life imprisonment by the Montgomery County Common Pleas Court on his no contest pleas to charges involving the death of his wife and his guilty plea to the involuntary manslaughter of Elmer Bloodsaw in a completely different and earlier homicide. He pleads two grounds for relief.

> **Ground One:** Petitioner was denied his right to due process because his plea was not entered knowingly, voluntarily, and intelligently in violation of the 5th, 6th, and 14th Amendments.
>
> **Supporting Facts:** Petitioner was rushed to take his plea, he expressed a misunderstanding of the law in the plea proceedings, he complained that he had not received documents necessary to make an informed decision and he would have to proceed to trial with unprepared counsel if he refused.
>
> **Ground Two:** Petitioner was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments.

1

> **Supporting Facts:**  Petitioner was denied effective assistance of trial counsel because counsel was unprepared for trial, failed to give Petitioner documents necessary for him to make an informed decision, and failed to explain the implications of the plea and sentence to the Petitioner.

(Petition, ECF No. 1.)

## Procedural History

In August 2011 Wilson was charged with two counts each of murder and felonious assault arising out of the August 7, 2011, homicide death of his wife; each count carried a firearm specification (State Court Record, ECF No. 13, PageID 51).  On December 2, 2011, in connection with the plea proceedings in this case, the prosecutor filed an Information charging Wilson with involuntary manslaughter for the homicide of Elmer Bloodsaw on October 10, 2000. *Id.*  at PageID 64. The parties agreed on a sentence of twenty-three years to life for all charges.  On December 20, 2011, the trial court merged the murder and felonious assault counts and the firearm specifications and sentenced Wilson to fifteen years to life for murder, three years consecutive on the firearm charge, and five years consecutive for the Bloodsaw homicide. *Id.,* Termination Entry at PageID 70-72.

Wilson appealed the murder conviction which was affirmed. *State v. Wilson*, Case No. 24975, 2013-Ohio-1076, 2013 Ohio App. LEXIS 953 (2nd Dist, Mar. 22, 2013), appellate jurisdiction declined, 136 Ohio St. 3d 1452 (2014).  While the appeal was pending, Wilson moved to withdraw both the no contest and the guilty pleas on grounds of ineffective assistance of trial counsel.  The trial court denied the motion and the Second District dismissed the appeal

as to the murder conviction because the trial court acted without jurisdiction, since the direct appeal was still pending; the decision as to the involuntary manslaughter plea was vacated and the case remanded. *State v. Wilson*, Case No. 25482, 2014-Ohio-1764, 2014 Ohio App. LEXIS 1728 (2nd Dist. Apr. 25, 2014).

After remand, the trial court again denied the motion to withdraw and Wilson again appealed. This time the Second District affirmed. *State v. Wilson,* Case No. 26354, 2015-Ohio-1584, 2015 Ohio App. LEXIS 1535 (2nd Dist. Apr. 24, 2015). The Ohio Supreme Court denied Wilson's motion for a delayed appeal to that court. *State v. Wilson*, 2015-Ohio-3733, 2015 Ohio LEXIS 2497 (2015).

Wilson had previously filed this habeas corpus action which was stayed pending exhaustion of his state court remedies. Following the Ohio Supreme Court decision, this Court vacated the stay (ECF No. 8), the Warden filed the State Court Record and a Return of Writ (ECF Nos. 13, 14), and Wilson has filed a Reply (ECF No. 16).

# ANALYSIS

## Ground One: Unconstitutional No Contest and Guilty Pleas

In his First Ground for Relief, Wilson claims his no contest plea on the murder charges and guilty plea to involuntary manslaughter are unconstitutional because they were not knowingly, intelligently, and voluntarily entered.

The Warden asserts that Wilson's claims as to his involuntary manslaughter conviction are barred by Ohio's criminal res judicata doctrine because he did not appeal from that conviction, but only from the murder conviction. *State v. Wilson,* 2015 Ohio App. LEXIS 1535, ¶ 23 (2nd Dist. Apr. 24, 2015).

The Ohio res judicata rule, adopted in *State v. Perry*, 10 Ohio St. 2d 175 (1967), has been repeatedly upheld in the Sixth Circuit as an adequate and independent state rule. *White v. Mitchell*, 431 F.3d 517, 527 (6th Cir. 2005), *citing Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. 2002); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000); *Rust v. Zent,* 17 F.3d 155, 160-61 (6th Cir. 1994); *Van Hook v. Anderson*, 127 F. Supp. 2d 899 (S.D. Ohio 2001).

In its last opinion dealing with this case, the Second District considered Wilson's claim that his trial attorney was ineffective because she did not inquire into medications he was taking at the time of his wife's death:

> **[*P7]** On August 3, 2012, while the direct appeal was still pending, Wilson (through new counsel) filed a motion to withdraw all of his pleas, claiming that he had received ineffective assistance of counsel. Wilson supported his motion with an affidavit, which indicated that he had taken medication that affected him on the night of his wife's murder and while "dealing with" his attorney, and that his attorney had failed to "check into these medications and their side-effects."

*State v. Wilson*, 2015-Ohio-1584, ¶ 7, 2015 Ohio App. LEXIS 1535, (2nd Dist. Apr. 24, 2015). Wilson makes no claims about the medications in his habeas corpus petition. Instead, he claims his plea should be vacated because (1) he was rushed to take his plea, (2) he expressed a misunderstanding of the law in the plea proceedings, (3) he complained that he had not received documents necessary to make an informed decision and (4) he would have to proceed to trial with unprepared counsel if he refused.

4

The Second District considered these claims on direct appeal.  It decided:

 [*P2]  Wilson contends that his no-contest pleas were not knowing and voluntary, and also that his trial counsel was ineffective in relation to those pleas. We conclude that the record supports the trial court's conclusion that Wilson's no-contest pleas were knowing and voluntary. We also find no support in the record for Wilson's contention that his trial counsel was ineffective. Accordingly, the judgment of the trial court is Affirmed.

## I. The Course of Proceedings

 [*P3]  Wilson was charged by indictment with Murder, in violation of R.C. 2903.02(B); with Murder, in violation of R.C. 2903.02(B); with Felonious Assault, in violation of R.C. 2903.11(A)(2); and with Felonious Assault, in violation of R.C. 2903.11(A)(1). All four charges included firearm specifications; all four also involved the same victim, Wilson's wife, Marny Wilson.

 [*P4]  Meanwhile, police were investigating the 2000 killing of Elmer L. Bloodsaw, which they believed was caused by Wilson. This homicide never resulted in an indictment.

 [*P5]  On Wednesday, November 30, 2011, with the trial of the Murder and Felonious Assault charges scheduled to begin the following Monday, the parties appeared in open court to discuss a possible plea bargain involving both homicides. The parties agreed that the charges involving the killing of Wilson's wife would all have to be merged. The State informed the trial court that there had been discussions between the parties concerning a proposal whereby Wilson would plead to the murder of his wife, and the State would accept a plea to manslaughter for the Bloodsaw homicide. The State indicated that without the plea agreement, the Bloodsaw homicide would probably be charged as a felony murder, with firearm specification, as well as other felony charges.

 [*P6]  The State informed the trial court that the State had originally discussed a total sentence, for both homicides, of "about 27 — somewhere in the mid-twenties." As of that morning, however, the State indicated that it would agree to a total sentence, for both homicides, of 23 years to life. This would involve Wilson's plea to the indicted charges, for which a trial was set to commence in five days, and his plea to Involuntary Manslaughter in the Bloodsaw homicide, with no firearm specifications or other charges. Wilson would receive a sentence of fifteen years to life for the Murder of his wife, three years for the firearm specification,

and five years for the Involuntary Manslaughter of Bloodsaw, to be served consecutively, for a total sentence of 23 years to life.

[*P7] Wilson complained that "I'm just now really finding out about this plea." His trial counsel pointed out that she had communicated the latest plea offer to Wilson the day before. Wilson asked for more time to discuss the plea offer with his family and to seek to retain counsel for a "second opinion" concerning the desirability of the plea offer.

[*P8] The trial court gave Wilson 20 minutes to consider the offer, but no more, considering the imminence of the trial. When the parties came back on the record, the State said that if Wilson would plead to his wife's Murder, Wilson could have until Friday, two days later, at noon, by which to accept the State's offer on the Bloodsaw homicide. Otherwise, that offer would be off the table.

[*P9] After being informed that the pleas tendered would be no-contest pleas, the trial court then conducted a full plea colloquy on the indicted charges. Wilson participated actively in the colloquy, asking intelligent questions about the potential penalties, the fact that the trial would otherwise go forward on the following Monday, and what would happen if he were able to retain counsel for the trial. (His current trial counsel was appointed.) At the end of the colloquy, the trial court gave Wilson the opportunity to discuss the matter with his trial counsel, "and we'll give you the time to do that now."

[*P10] When the plea proceeding resumed, the trial court corrected some misinformation it had provided concerning the degree of the Felonious Assault felonies, and the maximum possible fine (although the trial court told Wilson it would not impose a fine). Wilson then had some additional questions, which the trial court answered to Wilson's apparent satisfaction. These questions included Wilson's asking whether "this is appealable," to which the trial court responded, after some discussion, in the affirmative.

[*P11] The trial court accepted Wilson's no-contest plea to each of the four indicted charges, with specifications, and set the matter for sentencing.

[*P14] At the sentencing hearing, the four indicted counts were merged, and the State elected to have Wilson sentenced for the first Murder count. The firearm specifications were all merged. The trial court imposed the agreed-upon sentence: fifteen years to life

for the Murder of Wilson's wife, three years for the firearm specification, and five years for the Involuntary Manslaughter of Bloodsaw, all to be served consecutively, for a total sentence of 23 years to life.

[*P15] At the end of the sentencing hearing, Wilson's counsel informed the trial court that Wilson had been inquiring concerning his appellate rights. A colloquy ensued in which the following occurred:

MS. SPELLS: I've explained to him, Your Honor, what appellate rights he has and it's —

Your question to appeal the manslaughter case?

THE DEFENDANT: No.

MS. SPELLS: Murder?

THE DEFENDANT: Yes

[*P16] Consistently with the foregoing colloquy, Wilson filed a pro se notice of appeal the same day he was sentenced, in which he recites:

DEFENDANT MOVES THE COURT FOR AN [sic] SAID HEARING TO BE HELD ON. NOTICE OF APPEAL

—                    MEMORANDUM                    —

DEFENDANT WISHES TO APPEAL THE NO CONTEST PLEA.

[*P17] Of course, by appealing only from the Murder conviction, Wilson preserves the benefit of the five-year plea bargain for the Bloodsaw homicide, while seeking to reverse his eighteen-years-to-life Murder sentence.

**II. The Record Supports the Trial Court's Conclusion that Wilson's No-Contest Pleas Were Knowing and Voluntary**

[*P18] Wilson's First Assignment of Error is as follows:

A PLEA THAT IS NOT KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY ENTERED MUST BE VACATED.

7

 [*P19]  In support of this assignment of error, Wilson first argues that he "wasn't aware until his plea date that he was ineligible for community control," citing the following colloquy:

THE COURT: * * *

Now, you were never eligible, of course, in these cases for community control. Do you understand that?

THE DEFENDANT:  I'm not eligible for community control?

THE COURT: Or probation. You're not —

THE DEFENDANT: Right.

THE COURT: — going to get probation.

 [*P20]  When the concept of supervision in lieu of incarceration was presented to him as "probation," and when he was told that he wasn't going to get probation, Wilson did not express any difficulty with that concept. Just after this colloquy, the trial court explained the concepts of parole and post-release control, and the fact that Wilson's being technically subject to post-release control would be of no significance: "You'll have to be under the supervision of the Adult Parole Authority which you're going to be under their supervision for the murders anyway." Wilson indicated that he understood.

[*P21]  Wilson next argues that at sentencing, he "still had not received documents that he requested and obviously was not informed concerning the implications of his sentence. He simply did not understand." Wilson cites the following colloquy at the sentencing hearing:

THE COURT: * * *

Mr. Wilson, anything you'd like to say before the Court imposes sentence?

THE DEFENDANT: Yes, I'd like to say I needed some documents that I'm — I requested for the record.

THE COURT: Very well.

THE DEFENDANT: As far as the protective order that was dismissed initially.

THE COURT: M-hum.

THE DEFENDANT: I'm — I have not received that.

THE COURT: Okay. We'll ask your attorney to look into that. Anything additional?

THE DEFENDANT: Yes sir. What degree felony is this involun- - - involuntary manslaughter?

THE COURT: It is a —

MR. BRANDT [representing the State]: It's a felony of the first degree, Your Honor.

THE COURT: Felony one, yes.

THE DEFENDANT: Of what degree?

UNKNOWN MALE: It's a felony one.

THE DEFENDANT: That's just — that's just an F-1, no certain degree or nothin'?

THE COURT: No, it's a felony one.

THE DEFENDANT: Felony one, okay. Which one will be serving first?

THE COURT: M-hum.

THE DEFENDANT: Which one will I be serving first?

THE COURT: You'll be serving the three-year firearm specification on the murder specification first.

THE DEFENDANT: Then what?

THE COURT: Then you'll serve the attendant 15 years to life on that next.

THE DEFENDANT: Then when does — when does the five come in at?

THE COURT: I'm sorry?

THE DEFENDANT: I say when does the five years come in? At the end?

THE COURT: At the end, yes.

THE DEFENDANT: Okay. Where the — the deal papers at?

THE COURT: I believe that's the —

Do you have anything to add, Mr. Brandt?

MR. BRANDT: No, Your Honor. I'd just note for the record this is a negotiated plea with an agreed sentence, total combined, of 23 to life on both —

THE COURT: Right.

MR. BRANDT: — both the indictment as well as the (indiscernible) conviction.

THE COURT: Very well.

Anything further, Mr. Wilson?

THE DEFENDANT: So, is that correct the way that you said it would be served?

THE COURT: Yes.

THE DEFENDANT: And it's not concurrent?.

THE COURT: No.

THE DEFENDANT: And I get my time served?

THE COURT: Credit for time served according to law, yes.

THE DEFENDANT: Oh, that's it.

THE COURT: All right.

      *                    *                    *

Following your release from prison, should you ever be released, you will be serving a term of parole for the rest of your life. If you violate any condition of parole or any law, then the parole board could bring you back to prison for the rest of your life.

THE DEFENDANT: Excuse me. What was that?

THE COURT: You're going to be on parole.

THE DEFENDANT: The rest of my life?

THE COURT: Yes. If you get out, you'll be on parole for the rest of your life. And if you are revoked from parole, then you would then serve a sentence for the rest of your life.

 [*P22]  The above-quoted colloquy is from the sentencing hearing, and would not normally affect the question of whether the trial court erred in accepting Wilson's plea, since the trial court is not required to anticipate what may happen at a subsequent hearing in determining whether a plea is tendered knowingly and voluntarily. In any event, we find nothing remarkable in the above-quoted colloquy. Wilson had some questions, and the trial court answered those questions, to Wilson's apparent satisfaction.

 [*P23]  Wilson also argues that the transcript of the sentencing hearing shows that he did not understand his appellate rights. We find nothing in the sentencing hearing to reflect that Wilson did not understand his appellate rights. He had ascertained at the plea hearing on the indicted counts that by pleading no contest he was preserving his right to appeal:

THE DEFENDANT: And this is appealable?

THE COURT: Yes.

THE DEFENDANT: Thank you.

THE COURT: I mean, it's a no contest plea, so everything's —

THE DEFENDANT: Thank you.

 [*P24]  At the end of the sentencing hearing, Wilson expressed an

11

interest in appealing from the Murder conviction, but not from the Involuntary Manslaughter conviction. And Wilson did, in fact, appeal from the Murder conviction, on the same day that he was sentenced. There is nothing in this record to reflect that Wilson did not understand his appellate rights, much less that his inability to understand his appellate rights affected his decision to plead.

[*P25] Finally, Wilson argues that "[w]hen he indicated his concern about his representation, he was threatened by the Court with having to go to trial [with] unprepared counsel."

[*P26] At the outset of the plea hearing, Wilson's trial counsel informed the trial court that Wilson "indicated that he may have the financial resources to hire an attorney for a second opinion." Wilson's assigned counsel stated that she had done her preparation "and we are prepared and ready for Monday."

[*P27] It is clear from the record that Wilson would have liked more time to consider the State's plea offer. But there is nothing in the record to reflect that Wilson believed his assigned counsel was unprepared for trial, much less that she was, in fact, unprepared for trial.

[*P28] We have reviewed the transcripts of both plea proceedings and the sentencing hearing. We find nothing therein to reflect that Wilson's plea was other than knowing and voluntary. Wilson's First Assignment of Error is overruled.

*State v. Wilson*, 2013-Ohio-1076.

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000).

Here the Second District Court of Appeals decided the merits of Wilson's claim that his no contest plea to murdering his wife was not knowing, intelligent, and voluntary. Wilson cites

Supreme Court case law on the voluntariness of a no contest plea , but he does not suggest any way in which that decision was contrary to or an unreasonable application of the Supreme Court case law (Traverse, ECF No. 16, PageID 414, *citing Bradshaw v. Stumpff*, 545 U.S. 175 (2005), and *Brady v. United States*, 397 U.S. 742 (1970)).

He claims he was rushed, but the record shows the plea hearing took place less than a week before trial. Wilson was incarcerated awaiting trial and the length of time from the indictment to the scheduled trial date shows the trial court was very near the ninety-day speedy trial limit in Ohio Revised Code § 2945.71. Thus this is not a matter of a plea agreement being forced through early in the pre-trial process, but a last chance to settle before trial. Moreover, Wilson has not suggested how more time would have made a difference in his decision. That is, he did not tell the state courts nor has he told this Court anything he has learned since the plea that would have changed his mind about pleading. The plea colloquy makes it clear he knew what the agreed sentence would be and that he was not eligible for community control/probation. He may not have known that before the plea hearing, but it was explained to him in the course of the hearing and he said he understood then. His attorney clearly stated for the record that she had communicated the proposed plea agreement to him the day before.

One thing Wilson says he would have done if he had been given more time is to consult another attorney "who his family had retained to represent him." (Traverse, ECF No. 16, PageID 416.) As far as the record is concerned, this other attorney is a phantom. He or she never entered an appearance in the case and is unnamed in the record. Wilson does not indicate what advice the other attorney would have given about the plea or a trial.

Wilson says he had not received certain unspecified documents at the time of plea. One of those appears to have been a "protective order" that was "initially dismissed." Or there may

have been "discovery" documents that he wanted to see.  Assuming that there were documents Wilson wanted to see but had not seen as of the plea, he has not shown what those documents were or how their absence is relevant to the validity of the plea.

He claims he was forced to take the plea or go to trial with an unprepared attorney.  But Ms. Spells told the trial judge she was fully prepared to proceed and Wilson has not shown any way in which that was not so.

Undeniably, the decision to plead guilty or no contest to two homicides[1] with the result of a long sentence at the very least and exposure to life imprisonment at the worst is an important and weighty decision, probably the most serious decision Wilson ever had to make, other than the decisions to shoot two other people with fatal consequences.  Wilson is correct that he did not "really [have] much of a choice"  in the sense that his attractive choices were few (Traverse, ECF No. 16, PageID 417).  But he did receive a good deal:  He was sentenced to the minimum penalty prescribed by law for murder, fifteen years to life per Ohio Revised Code § 2929.02(B).  Because the murder of his wife was committed with a firearm, the additional three years on the firearm specification was mandatory.  And the prosecutor indicated he was prepared to indict Wilson on the Bloodsaw homicide for felony murder, so that five years for involuntary manslaughter was very lenient.  A prosecutor is not under any obligation to offer a plea agreement or an agreed sentence and Wilson makes no suggestion how he would have won at trial on any of the charges.

In sum, Wilson has not shown any way in which the Second District's decision that his no contest plea was knowing, intelligent, and voluntary is contrary to or an objectively unreasonable application of Supreme Court precedent.  His First Ground for Relief should therefore be dismissed on the merits.

---

[1] Wilson was given additional days to consider the plea offer on the Bloodsaw homicide.

**Ground Two:  Ineffective Assistance of Trial Counsel**

In his Second Ground for Relief, Wilson claims his conviction is tainted by ineffective assistance of trial counsel in that (1) counsel was unprepared for trial, (2) counsel failed to give Petitioner documents necessary for him to make an informed decision, and (3) counsel failed to explain the implications of the plea and sentence to the Petitioner.

The Second District Court of Appeals also decided this claim on the merits, writing:

> **[*P30]**  We find no support for this assignment of error in the record. Although Wilson at one point expressed an interest in seeking to retain counsel for a "second opinion" as to the desirability of the State's plea offer, he never questioned his assigned counsel's competence. In fact, in the following colloquy Wilson appears to have disclaimed any challenge to his assigned counsel's competence:
>
> THE DEFENDANT: So there's a constitutional right for me to not — not have new counsel? That's — is that against my constitutional rights? When — 'cause you said that it — it's still set for — for Monday for trial and I couldn't get new — new counsel on the record?
>
> THE COURT: You've indicated to the Court that you don't have the funds to hire a lawyer and so we appointed one to represent you. And the Court is comfortable with the fact that, you know, that this lawyer which the Court chose for you is competent, able to communicate with you and prepare a defense for trial and give you advice, good legal advice, throughout the proceeding and we're confident with that.
>
> Should you hire other counsel in the meantime, that would — I don't know if they could be ready by Monday to go to trial or not.
>
> THE DEFENDANT: So it's still set forth to go Monday, no matter what?
>
> THE COURT: Yeah, this case has been scheduled and we intend to go forward with it, yes.

15

THE DEFENDANT: *I'm not degrading her or anything*; I'm just that was just a question that I have.

THE COURT: M-hum.

THE DEFENDANT: For the record. (Emphasis added.)

**[*P31]** We have reviewed the transcripts of the plea hearings and sentencing hearing. There is nothing to indicate that assigned counsel was less than diligent in representing Wilson. Counsel conferred with Wilson on several occasions, and communicated Wilson's concerns to the trial court on other occasions. Counsel also made sure that the provisions in the plea agreement that were favorable were clearly set forth in the record.

**[*P32]** Wilson's Second Assignment of Error is overruled.

*State v. Wilson*, 2013-Ohio-1076.

As Wilson recognizes in his Traverse (ECF No. 16, PageID 417), the governing standard for ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687. In other words, to establish ineffective assistance, a defendant must show both deficient performance and prejudice. *Berghuis v. Thompkins,* 560 U.S. 370, 389 (2010), *citing Knowles v. Mirzayance,* 556 U.S. 111 (2009).

16

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694. *See also Darden v. Wainwright*, 477 U.S. 168, 184 (1986), *citing Strickland, supra*; *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998), *citing Strickland, supra*; *Blackburn v. Foltz*, 828 F.2d 1177, 1180 (6th Cir. 1987), *quoting Strickland,* 466 U.S. at 687. "The likelihood of a different result must be substantial, not just conceivable." *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011), *quoting Harrington v. Richter*, 562 U.S. 86, 111-12 (2011).

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. See *Wong v. Belmontes*, 558 U.S. 15, 27, 130 S. Ct. 383, 175 L. Ed. 2d 328 (2009) (per curiam); *Strickland*, 466 U.S., at 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. *Id.*, at 696, 104 S. Ct. 2052, 80 L. Ed. 2d 674. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." *Id.*, at 693, 697, 104 S. Ct. 2052, 80 L. Ed. 2d 674. The

likelihood of a different result must be substantial, not just conceivable. *Id.*, at 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

*Harrington v. Richter*, 562 U.S. 86, 111-112 (2011).

There is a constitutional right to the effective assistance of counsel in the plea bargain process, as well as at trial,  which includes the duty of an attorney to communicate an offered plea bargain.  *Missouri v. Frye*, 566 U.S. ___, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012); *Lafler v. Cooper*, 566 U.S. ___, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012).

The same *Strickland* standards apply in evaluating ineffective assistance claims in cases which resulted in a negotiated plea.  *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Sparks v. Sowders*, 852 F.2d 882, 884 (6th Cir. 1988).  In order to satisfy the "prejudice" prong of *Strickland* in a negotiated plea case, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty or no contest and would have insisted on going to trial.  *Hill*, 474 U.S. at 58.  Moreover, he must show that there would have been a reasonable chance he would have been acquitted had he gone to trial. *Id.* at 59.

The Supreme Court recently restated the standard for ineffective assistance of trial counsel claims when the state courts have decided those claims on the merits:

> "A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fair-minded jurists could disagree" on the correctness of the state court decision," *Harrington v. Richter,* 562 U.S. 86, 101 (2011)(quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004).  The state court decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall,* 572 U.S. ___, ___ (2014), slip op. at 4.
>
> When the claim at issue is one for ineffective assistance of counsel, moreover, AEDPA review is "doubly deferential," *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011), because counsel is "strongly presumed to have rendered adequate assistance and made all

> significant decisions in the exercise of reasonable professional judgment," *Burt v. Titlow*, 571 U.S. ___, ___ (2013), slip op. at 9)(quoting *Strickland v, Washington*, 466 U.S. 668, 690 (1984); internal quotation marks omitted). In such circumstances, federal courts are to afford "both the state court and the defense attorney the benefit of the doubt." at ___ (slip op. at 1).

*Woods v. Etherton*, 578 U.S. ___, slip op. at 3-4, 2016 U.S. LEXIS 2277 (Apr. 4, 2016)(per curiam; unanimous), *reversing Etherton v. Rivard*, 800 F.3d 737 (2015).

Wilson fails to meet this high standard for overcoming the Second District's decision. Wilson claims he did not understand the terms and conditions of the pleas he was entering (Traverse, ECF No. 417). If he means that Ms. Spells did not explain them to him before the hearing, there is nothing of record to demonstrate that. At the time of the hearing, the trial judge thoroughly explained the consequences of the pleas, so that whatever his attorney may or may not have told him off the record becomes irrelevant.

Wilson repeats that "he had serious reservations about the ability of his trial counsel and that he had taken the initiative to retain other counsel." (Traverse, ECF No. 16, PageID 417.) But he gives no content to the "serious reservations" comment, and his trial attorney, Mia Wortham Spells, was a highly respected member of the criminal bar in Dayton before she was elected Judge of the Dayton Municipal Court in November 2015. Wilson's "initiative" to obtain new counsel had not reached the point where new counsel appeared. Wilson's apparent belief that new counsel could automatically obtain a trial continuance was punctured by the trial judge's comment that trial would go forward with new or old counsel on the following Monday. Wilson explains that his new lawyer was supposed to be in court with him at the hearing, but could not get there in time. *Id.* Again, as noted under Ground One, there is absolutely no extrinsic evidence to show that another attorney had been retained and was prepared to take over the case and try it on less than a week's notice.

Wilson complains Ms. Spells had not given him "any of the documents pertaining to his case." (Traverse, ECF No. 16, PageID 412.)  He particularly complains about receiving the Bill of Information (which he refers to as the Bill of Particulars) on the date of the plea and being forced to waive the one-day notice requirement. *Id.*  As noted above with respect to Ground One, he has not identified the papers he wanted (except for a protective order) nor shown how failure to provide them somehow made Ms. Spells ineffective.  Waiver of the one-day notice on the bill of information is merely a formalistic statutory requirement in Ohio law.  Wilson has not shown any way in which that prejudiced him.

Wilson argues that he had a right to counsel of his choice when he could afford to hire counsel.  That is certainly true.  If Wilson had actually come to court with a new retained attorney or, even if the attorney was unable to be present, that attorney had entered an appearance, then the trial judge would have been obliged to allow a change of counsel and to consider new counsel's motion for continuance if one had been made.  But there is no constitutional right to keep changing attorneys and getting continuances of trial.

The decision to grant or deny a motion for continuance lies within the sound discretion of the trial court and cannot be reversed absent a showing that the decision was arbitrary, unreasonable, or unconscionable. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).  Factors which should be considered are the length of the delay requested;  whether other continuances have been requested and received;  the inconvenience to litigants, witnesses, opposing counsel, and the court;  whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived;  whether the party seeking the continuance contributed to the circumstances which gave rise to the request;  and other relevant factors, depending on the unique facts of each case. *State v. Unger,* 67 Ohio St. 2d 65, 67 (1981), *citing United States v.*

*Burton*, 584 F.2d 485 (D.C. Cir. 1978), and *Giacalone v. Lucas*, 445 F.2d 1238 (6th Cir. 1971).

It is not infrequently the case that criminal defendants will claim to be getting new counsel in the hopes of delaying a trial, but it is also frequently true that no new attorney has been retained or the money cannot actually be raised. Trial judges are rightly skeptical of last-minute substitutions coupled with requests for delay. Here the promise of new counsel was so vague that the trial judge could not inquire of the proposed new attorney whether he or she was ready for trial. Wilson emphasizes that "[t]he state court record contains no reasons why the trial could not have been continued and it contains no potential prejudice to the State or to the court for a brief delay." (Traverse, ECF No. 16, PageID 418.) But the State is not required to give reasons for denying a continuance that was never requested. Wilson's claim that any delay would have been "brief" is purely speculative – he does not say how long is new attorney would have wanted to prepare for trial.

All of Wilson's complaints about his attorney's performance assume that, had she done what he claims she should have done, he would have received a better deal than he got. But it is hard to imagine a better deal and Wilson does not provide any detail on how that could have come about. For example, he claims she never explained to him that he would not be eligible for community control on a murder conviction. Assuming that is true, Wilson suffered no prejudice because the trial judge explained that to him. Wilson does not claim that he ever expected to get probation or how that could have been a reasonable expectation for two completely separate homicides.

Wilson has not shown that the Second District's decision on his ineffective assistance of trial counsel claim was contrary to or an objectively unreasonable application of *Strickland*. His Second Ground for Relief should therefore be denied.

**Conclusion**

In accordance with the foregoing analysis, it is respectfully recommended that the Petition be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.

April 13, 2016.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).